IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BRAD HARBISON, as Independent Administrator of the Estate of Danielle Renee Harbison and as next friend of minor children Wes Harbison and Molly Harbison, | **8:20CV245** |
| Plaintiff, | |
| v. | |
| COUNTY OF SARPY,  SARPY COUNTY SHERIFF'S OFFICE, and JEFF DAVIS, Sarpy County Sheriff, in his official capacity, | **MEMORANDUM AND ORDER** |
| Defendants. | |

This matter is before the Court on defendants County of Sarpy (the "county"), Sarpy County Sheriff's Office (the "sheriff's office"), and Sheriff Jeff Davis's ("Sheriff Davis" and together, the "defendants") Motion for Summary Judgment (Filing No. 252) as well as plaintiff Brad Harbison's ("Harbison") motion for partial summary judgment (Filing No. 255). *See* Fed. R. Civ. P. 56; NECivR 56.1. For the reasons that follow, both motions are denied.

## I.    BACKGROUND

### A.    Factual Background

#### 1.    Initial Encounter

In the early evening hours of June 23, 2018, Bellevue Police Department ("Bellevue Police") Officers Matt McGinn ("Officer McGinn") and Aaron Jezek ("Officer Jezek" and together, the "police officers") were called to perform a wellness check for a woman who was passed out behind the wheel of her truck on a road near the Bellevue Medical Center in Bellevue, Nebraska.  The police officers later identified the woman as Danielle Renee Harbison ("Danielle"), a 37 year-old resident of Freeburg,

Illinois.  When the police officers approached Danielle, they found her slumped over in the driver's seat, her foot on the brake pedals and the truck still in gear.

The police officers opened the doors to the truck on both sides, put it in park, and turned off the ignition.  Officer Jezek leaned in from the driver's side door, attempting to wake Danielle and asking her questions to discern her condition.  Danielle awoke and was initially very lethargic.  She answered Officer Jezek's questions slowly and incompletely.  When Officer Jezek asked what substances she had taken that day, she responded breathily, "I'm tired."

As the encounter continued, Danielle demonstrated difficulty answering questions and completing simple tasks like locating her driver's license.  She informed Officer Jezek that she was from Illinois but was in Nebraska with her boyfriend.  Between slow, slurred responses to the police officers' questions, she repeated that she was very tired. Danielle denied any alcohol consumption and explained she sometimes took heartburn and sleeping medication.

At this time, Danielle also had difficulty explaining where she was.  She asked the police officers, "What happened?," and told Officer Jezek her hotel was "around the corner" but could not explain why she was over a mile away from the hotel.  While the police officers waited for the Bellevue Fire Department ("Bellevue Fire") and Emergency Medical Services ("EMS") to respond to their call regarding an incident of an "unknown medical nature," they observed Danielle for several minutes, noticing her slurred speech, watery eyes, and difficulty focusing and answering questions.  According to the police officers, they were trying to determine whether or not Danielle needed emergency medical attention but did not yet suspect she was intoxicated.

When Bellevue Fire and EMS arrived, Bellevue Fire emergency medical technician ("EMT") Erin McCormick ("McCormick") approached Danielle—who was still sitting in the driver's seat of her truck—to assess the situation.  McCormick asked

2

her a few questions, and Danielle replied that she was fine and wanted to go home. McCormick did not discuss the situation with the police officers or gather information from them about Danielle's circumstances or condition. As McCormick spoke with Danielle, other EMS personnel informed the police officers they could smell the odor of alcohol on Danielle and that she had admitted to drinking.

McCormick claimed that, from her brief observation, she believed Danielle was alert and not experiencing any obvious medical emergency. She also stated that Danielle refused EMS's request to take her vitals or for her to step out of the vehicle to be checked. Based on that resistance and her visual assessment of Danielle's condition, McCormick made the decision to leave the scene about four minutes after she arrived.

As Bellevue Fire and EMS left, the police officers asked Danielle to step out of her truck. Officer Jezek escorted Danielle as she walked away from the vehicle, locking his arm with hers. The police officers then began performing standard field sobriety tests on Danielle. The first test they performed, the horizontal gaze nystagmus test, indicated Danielle was intoxicated.

As the police officers prepared to conduct further sobriety tests, they noticed Danielle was not steady on her feet and had trouble balancing. Danielle seemed to have difficultly following the police officers' instructions for the nine-step walk test and, when she attempted the test, was unable to walk without wobbling or staggering. The police officers made the decision to halt the testing out of concern for her safety in light of the nearby traffic.

The police officers then explained to Danielle they would perform a breathalyzer test. When Danielle began walking away, the police officers secured her. They also ensured the dog in her car was safe.

The police officers instructed Danielle to blow into the breathalyzer. After multiple unsuccessful attempts, Danielle blew and the machine indicated her blood

alcohol content ("BAC") was .34. The police officers immediately put her under arrest for driving under the influence. About forty minutes after the police officers arrived at the scene, Officer Jezek left for the jail with Danielle in his cruiser.

### 2. Jail Custody

Once Officer Jezek arrived at the Sarpy County Jail with Danielle, Correctional Officer Allysa Range ("CO Range")[1] assisted in getting Danielle out of the cruiser, which took a few minutes. CO Range noticed Danielle was not able to maintain a steady balance by herself, so she held her right arm as she walked through the garage to the jail entrance. Danielle answered CO Range's questions through slurred speech.

CO Range asked Officer Jezek about the circumstances of Danielle's arrest. Officer Jezek informed CO Range that Danielle had a BAC of .34. Immediately thereafter, CO Range asked Officer Jezek if Danielle had been medically cleared. Officer Jezek told CO Range that EMS "medically cleared" Danielle but apparently did not provide further details regarding the circumstances of their visit to the scene or any documentary proof of such clearance.

As detailed above, McCormick did not conduct any medical evaluation of Danielle due to her refusal and admits that Danielle was not "medically cleared," as she understands that phrase. Nevertheless, through their conversations with Officer Jezek and each other, Sergeant Mark Shiller ("Sergeant Shiller"), Correctional Officer Cody Kruse ("CO Kruse"), and Correctional Officer Timothy Kendall ("CO Kendall") all came to believe Danielle had been medically cleared before arriving at the jail.

Several of the correctional officers believed there was an informal rule among the officials, set by Sergeant Daniel Potmesil ("Sergeant Potmesil") in particular, that anyone with a BAC over .3 needed to be medically cleared before being accepted at the jail.

---

[1]According to her deposition testimony, CO Range has since been married and is now Allysa Potmesil. Because the record refers to her by her former surname, the Court continues to use it as well.

Confusion over the existence of any formal policy in that vein led Sergeant Shiller to contact Lieutenant Mark Topil ("Lieutenant Topil") by text to get guidance on the situation. Lieutenant Topil advised Sergeant Shiller he was unaware of any such BAC limit for accepting an individual into the jail but remained in contact with him and received updates on Danielle throughout the night.

Sergeant Shiller decided to test Danielle's BAC again. At that point, the device at the jail read that Danielle had a .323 BAC. Sergeant Shiller believed she may have "been on the way down" based on this reading and her cooperation with the officers.

In large part due to the understanding she was medically cleared and improving, Danielle was booked into the jail. Correctional Officer Aaron Jones ("CO Jones") worked with Danielle to fill out the booking sheet. Danielle appeared very intoxicated and leaned on the counter for support during the process but was cooperative with and friendly toward the officers. Harbison alleges that, despite being able to sign the booking form and answer some of the officers' questions, Danielle was unable to otherwise complete the usual booking process due to her level of intoxication. Sergeant Shiller stated he intended for Danielle to "sober up" and complete the booking process upon being released.

Danielle was eventually placed in the H1 individual watch cell near the booking counter. Sergeant Shiller also placed Danielle on a fifteen-minute watch due to her level of intoxication, and orally notified the correctional officers on duty of this decision. In contravention of the Standard Operating Procedure for Sarpy County Jail, no paperwork was completed to memorialize and notify others of the watch put in place.

The jail officers also lacked clarity about the type of watch Sergeant Shiller imposed. Sergeant Shiller averred he believed the watch only to be behavioral in nature, which requires no medical clearance, but admitted that he failed to categorize the watch

to the on-duty officers. Those officers were all aware, however, that her severe intoxication was the reason for the watch.

Putting Danielle under a medical watch, alternatively, would have required the jail officers to have her screened by a nurse. No such screening was ever conducted of Danielle. In fact, the on-duty nurse was never notified of the correctional officers' concerns regarding Danielle's condition.

Also in violation of the jail's procedures, the correctional officers failed to complete a "special watch log" to document their observations during the night. The officers checked on Danielle regularly, though there is some indication they did not strictly follow the fifteen-minute watch schedule and—at times—waited around twenty minutes between checks.

Danielle's condition worsened throughout the night. As the only female officer on duty, CO Range was instructed to help Danielle use the restroom so she didn't fall down. According to CO Range, Danielle "ended up passing out on the toilet." CO Range helped Danielle back into bed with the assistance of CO Kendall and CO Kruse. During that time, they observed that Danielle could not stand on her own and was mumbling unintelligently at times. They noted though that Danielle was talking and joking with them at other times.

Sometime later, CO Range noticed Danielle had spit coming out of her mouth and asked her if she was going to be sick. Danielle nodded her head, and CO Range and CO Kruse retrieved a trash can for her. Once Danielle began throwing up, CO Range brought her Gatorade. Danielle was unable to swallow the Gatorade and began dry heaving.

Once the dry heaving subsided, CO Range states she helped Danielle lay back on the bed on her side and left the cell. On the video recording from the booking area, CO Range can be seen saying she had never "been worried like this before." CO Range

notified Sergeant Shiller that Danielle was vomiting and dry heaving. Still, no one notified the on-site nurse or any other medical professional.

The video recording also captured CO Range, CO Kruse, and CO Kendall discussing Danielle's vomit on the cell's floor and bed. The officers joked and laughed about Danielle's condition and who would have to clean up after her, saying, "That's bad, that's bad," "I am not cleaning up vomit," "Is she shaking?," and "That shit's hilarious."

Later that night, CO Range found Danielle snoring while she laid on her side on the floor. According to CO Kendall, Sergeant Shiller advised the officers to leave Danielle on the floor. As CO Range checked on her, Danielle was continually found laying on the floor snoring, her face just inches away from the trashcan the officers brought to her cell.

Around 2:00 a.m., CO Kendall checked on Danielle and noticed she was not breathing. Based on the varying reports of the incident, Danielle was found unresponsive with her head either in the trashcan or near it. The on-duty correctional officers went to the cell to help and unsuccessfully tried to wake Danielle.

The officers carried Danielle to the booking area hallway and Sergeant Potmesil began doing chest compressions. Sergeant Shiller called EMS and notified Lieutenant Topil. CO Range continued to perform chest compressions.

The Papillion Fire Department transported Danielle to Midlands Hospital. There, she was tragically pronounced dead at 2:30 a.m. The cause of death was listed as acute alcohol toxicity.

###    B.    Procedural Background

On June 22, 2020, Harbison brought this lawsuit (Filing No. 1) as the administrator of Danielle's estate as well as the next of friend of his two minor children with Danielle. After stipulating to the dismissal of the City of Papillion, Papillion Fire &

Rescue, and Wellpath, LLC[2] (Filing No. 79), Harbison filed a Second Amended Complaint (Filing No. 86). *See* Fed. R. Civ. P. 15, 41(a). The Second Amended Complaint alleges three claims:

1. Official-capacity claims under 42 U.S.C. § 1983 against Sheriff Davis, and Lieutenant Topil, Sergeant Shiller, Sergeant Potmesil, CO Range, CO Kendall, CO Kruse, CO Jones, and Correctional Officer Reece Post ("CO Post" and together, the "jail officers"), Bellevue Police Chief Mark Elbert ("Chief Elbert"), Officer Jezek, Officer McGinn, Bellevue Fire Chief Perry Guido ("Chief Guido"), McCormick, and EMTs Jason Weber ("Weber"), Mark Armstrong ("Armstrong"), Eric Mixan ("Mixan"), and Keith Sanders ("Sanders" and together, the "EMTs").

2. Individual-capacity claims under 42 U.S.C. § 1983 against the jail officers, police officers, and EMTs.

3. Claims under the Political Subdivision Tort Claims Act ("PSTCA"), Neb. Rev. Stat. § 13-901 *et seq.*

Those defendants answered the Second Amended Complaint, and the parties began discovery. Harbison subsequently stipulated to the dismissal of all of his claims against Lieutenant Topil, Sergeant Potmesil, CO Post, Officer McGinn, Sanders, Chief Elbert, and Chief Guido (Filing Nos. 136, 146, 154). *See* Fed. R. Civ. P. 41(a). The final deadline for filing motions for qualified immunity was set for November 2, 2021, following some extensions (Filing No. 157).

By that deadline, Officer Jezek, McCormick, Mixan, Armstrong, Weber, Sergeant Shiller, CO Range, CO Kendall, CO Kruse, and CO Jones all moved for summary judgment on the individual-capacity claims against them based on qualified immunity. The City of Bellevue also filed a Motion for Summary Judgment at that time (Filing No. 171) asserting (1) the individual Bellevue officials were "entitled to qualified immunity," (2) there was "no unconstitutional policy, practice, or custom of Bellevue"

---

[2]According to Harbison's Amended Complaint (Filing No. 39), Wellpath, LLC, "provides health and medical care in the Sarpy County Jail pursuant to contract with" the county.

underlying Harbison's claims, and (3) Harbison's PSTCA claims were "barred under Neb. Rev. Stat. § 13-910(7)," commonly known as the "intentional-tort exception."

Harbison opposed these motions, but stipulated to the dismissal of CO Jones, Armstrong, and Mixan (Filing No. 194).  *See* Fed. R. Civ. P. 41(a)(1)(A)(ii).  On March 9, 2022, the judge originally assigned to this matter recused himself sua sponte.  *See* 28 U.S.C. § 455(a) ("Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.").

On August 3, 2022, the Court granted all of the officials' motions for summary judgment (Filing No. 216) on the individual-capacity claims against them.  *See Litrell v. Franklin*, 388 F.3d 578, 584-85 (8th Cir. 2004) (stating "[t]he issue of qualified immunity is [generally] a question of law" but "is frequently intertwined with unresolved factual question" which must be submitted to a jury).  In doing so, the Court noted "the plaintiff failed to respond to all of [those] defendants' statements of material facts as required by Nebraska Civil Rule 56.1" and deemed those facts admitted.  The Court found Harbison failed to supply sufficient evidence Officer Jezek and the jail officers "responded to [Danielle's serious medical] need with deliberate indifference" to raise a fact issue precluding summary judgment.  Harbison also did not show the EMTs were aware of Danielle's serious medical need during their brief interaction at the scene.

On September 29, 2022, the Court found Bellevue likewise was entitled to summary judgment on facts deemed admitted (Filing No. 217).  While noting "[a] determination of qualified immunity in favor of individual defendants does not necessarily mean there is no constitutional violation by the municipality," the Court found Bellevue could not be liable under § 1983 because the Court had determined the Bellevue officials "neither acted with deliberate indifference nor violated [Danielle's] constitutional rights."  Believing Harbison had "not appear[ed] to dispute that false

9

imprisonment [was] at issue," the Court also found the PSTCA claim against Bellevue was barred by the intentional-tort exception.

Harbison and the remaining defendants continued discovery for the next year or so. In the meantime, each side retained experts and served the requisite disclosures. *See* Fed. R. Civ. P. 26(a)(2).

On February 9, 2024, the parties filed the present cross-motions for summary judgment. *See* Fed. R. Civ. P. 56; NECivR 56.1. Unsurprisingly, they oppose each other's motions. The defendants assert the Court's prior finding that the jail officers were entitled to qualified immunity requires the dismissal of the § 1983 claim against Sarpy County. They also contend the intentional-tort exception bars Harbison's PSTCA claim.[3]

For his part, Harbison seeks partial summary judgment on the issue of liability on both his § 1983 and PSTCA claims, leaving "[t]he issue of damages, including causation of damages" for trial. He argues that there is no genuine issue of material fact as to the defendants' liability under those laws, and that his experts establish "that had [Danielle] received medical attention she would not have died."

On April 12, 2024, the Court noted the defendants' motion for summary judgment was not properly accompanied by a statement of material facts (Filing No. 275).[4] *See*

---

[3]A majority of the defendants' 3,899-word brief constitutes largely unattributed, word-for-word copying of the work of Bellevue's counsel (Filing No. 164) as well as the Court's earlier Memorandum and Order (Filing No. 217) in this case. Such large-scale plagiarism is unacceptable and disingenuous. *See* Neb. R. Prof. Conduct §§ 3-503, 504 (generally requiring honesty and candor in dealing with the courts and third parties); *United States v. Bowen*, 194 F. App'x 393, 402 n.3 (6th Cir. 2006) ("While our legal system stands upon the building blocks of precedent, necessitating some amount of quotation or paraphrasing, citation to authority is absolutely required when language is borrowed.").

[4]The defendants further failed to follow proper summary judgment procedures in filing a "Reply Brief in Opposition to Plaintiffs' motion for Summary Judgment" (Filing No. 270). A reply brief is only permitted "in support of a motion for summary

NECivR 56.1(a).  The Court ordered the defendants to file such a statement in accordance with the local rules and gave Harbison ten days to respond to those facts once filed.  *See* NECivR 56.1(b)(1).  The Court also dismissed as superfluous any official-capacity claims remaining against individually named jail officials.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.")

The parties have made their submissions in accordance with that order (Filing Nos. 278, 279).  The motions are now ripe for the Court's determination.

## II.    DISCUSSION

### A.    Standard of Review

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'"  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The moving party can satisfy its burden in either of two ways: it can produce evidence negating an essential element of the nonmoving party's case, or it can show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial."  *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018); *see also Celotex*, 477 U.S. at 325.

---

judgment," not in further opposition to an opposing party's motion.  NECivR 7.1(c).  The defendants already had an opportunity to oppose (Filing No. 262) Harbison's motion for summary judgment and do not get another bite at the apple without leave from the Court.  *See* NECivR 7.1(b)(1), (c)(3).  The Court therefore does not consider the defendants' unauthorized surreply in its analysis of the cross-motions.

In response, the nonmoving party must submit evidence "of specific facts showing the presence of a genuine issue for trial." *Bedford*, 880 F.3d at 997. Such an issue exists when the nonmovant "present[s] enough evidence that a jury could reasonably find in his favor." *Id.*; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (explaining that at the summary judgment stage it is not the judge's function "to weigh the evidence and determine the truth of the matter").

The Court must view the facts "in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *Schilf v. Eli Lily & Co.*, 687 F.3d 947, 948 (8th Cir. 2012) (stating the court gives the nonmovant "the benefit of all reasonable inferences"). "Cross-motions for summary judgment [therefore] require viewing the evidence in the light most favorable to the plaintiff and defendant[s] in turn, depending on whose motion is being considered." *Pitman Farms v. Kuehl Poultry, LLC*, 48 F.4th 866, 875 (8th Cir. 2022).

### B.     Analysis

#### 1.     Defendants' Motion for Summary Judgment

In arguing they are entitled to summary judgment, the defendants rely almost entirely on the orders the Court entered nearly two years ago. In short, they assert the Court's earlier findings that the individual officers were entitled to summary judgment on the individual-capacity claims and that Bellevue was immune from suit under the PSTCA preordain their victory on Harbison's claims against them. Things are not nearly that simple, and the record before the Court is substantially different from that on the earlier motions in this case.

##### a.     Proper Parties

As an initial matter, the Court agrees with the defendants that Harbison's remaining claims are essentially ones against the county. As the Court previously recognized, the official-capacity claims Harbison has asserted against county officials— including his remaining claim against Sherriff Davis—are superfluous of his § 1983

claim against the county. *See Graham*, 473 U.S. at 165-66; *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (concluding the district court properly dismissed an official-capacity claim against a government officer as redundant of claims against the entity).

Under Nebraska law, moreover, a county sheriff's office must be sued "in the proper name of the county" since it is not a political subdivision with the independent ability to sue and be sued. *Holmstedt v. York Cnty. Jail Supervisor*, 739 N.W.2d 449, 461 (Neb. Ct. App. 2007), *rev'd in part on other grounds* 745 N.W.2d 317, 325 (Neb. 2008); *see also Parsons v. McCann*, 138 F. Supp. 3d 1086, 1097 (D. Neb. 2015) ("Each county in Nebraska may sue and be sued in its own name . . . but the same is not true of county offices or departments."). Thus, Harbison's claims will proceed only against the county itself.

### b.    Section 1983 Claim

Section 1983 creates liability for anyone who, under the color of state law, causes the deprivation of another's rights "secured by the Constitution and laws" of the United States. As the administrator of Danielle's estate, Harbison has the right to seek relief for Danielle's injuries under § 1983. *See Andrews v. Neer*, 253 F.3d 1052, 1056 (8th Cir. 2001) (explaining state law governs who is a proper plaintiff in a § 1983 case where the injured party has died); Neb. Rev. Stat. § 30-810 (permitting a wrongful-death suit to be brought by the decedent's personal representative).[5]

---

[5] Danielle was a resident of Illinois and her probate was filed in St. Clair County, Illinois. Though Nebraska law controls this question, *see Estate of Guled by and through Abdi v. City of Minneapolis*, 869 F.3d 680, 684 (8th Cir. 2017) (citing 42 U.S.C. § 1988(a) in explaining that the wrongful-death statute of the forum state governed whether the plaintiff had standing in a § 1983 suit), Illinois law would also permit Harbison to bring a wrongful-death action for Danielle's injuries, *see* 740 Ill. Comp. Stat. 180/2. Either way, the parties do not discuss Harbison's ability to bring this claim on her behalf.

13

Political subdivisions like counties may be liable under § 1983 but, unlike individual officers in individual-capacity suits, cannot "assert personal immunity defenses" like qualified immunity. *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *see also Brabbit v. Capra*, 59 F.4th 349, 354 (8th Cir. 2023). For § 1983 liability to attach, a plaintiff must establish an underlying constitutional violation by a county employee. *See Whitney v. City of St. Louis*, 887 F.3d 857, 860-61 (8th Cir. 2018); *Smith v. Lisenbe*, 73 F.4th 596, 601-02 (8th Cir. 2023). But a county "cannot be held liable under § 1983 on a *respondeat superior* theory" that is, "for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Social Servs. of NYC*, 436 U.S. 658, 691, 694 (1978). Thus, a plaintiff must also demonstrate a county's "policy or custom" sufficiently caused the claimed injury. *Id*. at 694.

Harbison asserts county officials deprived Danielle of her rights under the Fourteenth Amendment to the United States Constitution. Under that amendment, a pretrial detainee, like a prisoner, "has a constitutional right to adequate medical care while in custody." *Dadd v. Anoka County*, 827 F.3d 749, 756 (8th Cir. 2016); *see also Smith-Dandrige v. Geanolous*, 97 F.4th 569, 575 (8th Cir. 2024) ("A pretrial detainee's deliberate indifference claim is governed by the Fourteenth Amendment[,] which extends to detainees at least the same protections that convicted prisoners receive under the Eighth Amendment." (quoting *Perry v. Adams*, 993 F.3d 584, 587 (8th Cir. 2021) (alterations in original))). That right is violated when officials respond to a pretrial detainee's serious medical needs with deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

"Each step of [the] inquiry is fact-intensive" with respect to such a claim. *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). To make a showing of deliberate indifference, a plaintiff must establish both the "objective and subjective prongs" of the standard. *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016). Thus, a "plaintiff must prove 'that he suffered from an objectively serious medical need' and 'that [the officials]

14

actually knew of but deliberately disregarded his serious medical need.'"  *Id.* (quoting *Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014)); *see also Farmer v. Brennan*, 511 U.S. 825, 829 (explaining that "deliberate indifference" requires "a showing that the official was subjectively aware of the risk").  "A serious medical need is one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Dadd*, 827 F.3d at 755 (internal citations omitted).

Further, "deliberate indifference describes a state of mind" similar to subjective recklessness, which is "more blameworthy than negligence." *Farmer*, 511 U.S. at 835-37 (describing the "subjective recklessness" standard in criminal law).  But a "claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842.

Such a sufficiently culpable "mental state can be inferred [] from facts that demonstrate that a medical need was obvious and that the officer's response was 'obviously inadequate.'" *Barton v. Taber*, 820 F.3d 958, 965 (8th Cir. 2016) ("*Barton I*") (quoting *Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013)); *see also McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009) ("Intentional delay in providing medical treatment shows deliberate disregard if a reasonable person would know that the inmate requires medical attention or the actions of the officers are so dangerous that a knowledge of the risk may be presumed.").  A complete deprivation of care is not necessary. *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (stating "[g]rossly incompetent or inadequate care" may constitute deliberate indifference (quoting *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990))).

On the jail officers' motions for summary judgment, argued two-and-a-half years ago, the Court found Harbison had sufficiently established that Danielle "was suffering from an objectively serious medical need while in the presence of" the jail officers.  That

is still true on the record and motions now before the Court, and the county does little—if anything—to rebut that conclusion.

At that point, however, the Court found Harbison had failed to establish the jail officers acted with deliberate indifference. Having deemed admitted the jail officers' statement of facts, the Court explained Harbison had not provided sufficient evidence demonstrating the jail officers acted with a mental state akin to criminal recklessness, though it was clear they could have done more to help Danielle.

The county seeks to replicate that result here with little effort. But this time, unlike before, Harbison has properly responded to the county's fact statement, retained multiple experts, and filed a robust statement of facts largely supported by the extensive record he has created. *See Murphy v. FedEx Nat'l LTL, Inc.*, 618 F.3d 893, 905-06 (8th Cir. 2010) (explaining the law-of-the-case doctrine, requiring courts to adhere to their prior rulings on issues of law, "only applies to final orders, not interlocutory orders"); *Trujillo v. Bd. of Educ. of Albuquerque Pub. Schs.*, 212 F. App'x 760, 766 (10th Cir. 2007) (stating the law-of-the-case doctrine did not apply to a subsequent motion for summary judgment involving the court's "consideration of new facts" which did "not involve a change in the district court's application of any rule of law"); *Hamilton v. Leavy*, 322 F.3d 776, 787 (3d Cir. 2003) (stating the law-of-the-case doctrine may not apply where the court previously found "the record evidence did not permit the entry of summary judgment . . . at that time" but the parties later "engaged in discovery and supplemented the record" which then contained "evidence materially deviating from the record at the prior stage).[6]

Based on those differences, the Court believes Harbison has pushed the issue over the line on the present motions, showing a reasonable jury could find at least some of the

---

[6]The county does not refer to the law-of-the-case doctrine, nor really any other legal principle, to support its unfettered reliance on the Court's previous interlocutory orders.

16

jail officers knew of "a substantial risk of serious harm" toward Danielle if she did not receive proper care, and still failed to act. *Farmer*, 511 U.S. at 842. Overall, the record indicates the jail officers were aware of Danielle's severe level of intoxication and deteriorating condition throughout the night. To start, the jail officers demonstrated awareness of the risk the situation upon being notified of her .34 BAC by—among other things—asking whether she had been medically cleared, contacting Lieutenant Topil for guidance, and placing her on a watch.

A reasonable jury could also find that Danielle's worsening symptoms demonstrated an obvious need to get her medical care. From the time she arrived at the jail, Danielle had difficulty performing simple tasks, walking steadily on her own, and completing the booking process. The record demonstrates that, as the night went on, she became less coherent, fell asleep on the toilet, required assistance to stand or walk, was unable to ingest liquids, and began to vomit and dry heave. A reasonable jury could conclude that, by the time Danielle displayed these more serious symptoms, "a reasonable person would know that [she] require[d] medical attention or [that the] actions of the [jail] officers [were] so dangerous that a knowledge of the risk" is presumable. *McRaven*, 577 F.3d at 980 (concluding officers who knew of an inmate's ingestion of a large quantity of drugs and witnessed his "symptoms of intoxication," including slurred speech, sleepiness, and poor coordination, were not entitled to summary judgment on whether they were deliberately indifferent to the inmate's medical needs).

On this record, the Court finds Harbison has adduced sufficient evidence of the jail officers' deliberate indifference to prevent the entry of summary judgment in the county's favor. In the face of the arguably obvious, serious risk to Danielle's safety, a reasonable jury could conclude the jail officers' response—in which they failed to render any medical care until Danielle was found unconscious—was "obviously inadequate." *Barton I*, 820 F.3d at 965 (quoting *Thompson*, 730 F.3d at 747). The county's wholesale reliance on the Court's previous qualified-immunity decision fails to unequivocally take

17

these issues from the jury. *See Thurmond v. Andrews*, 972 F.3d 1007, 1013 (8th Cir. 2020) (explaining the determination of a county's liability does not necessarily "flow from the resolution of the qualified immunity issue"); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (stating summary judgment is only appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

That a reasonable jury could find "the existence of a constitutional violation is a threshold issue for a *Monell* claim to move forward" against a county. *Rusness v. Becker County*, 31 F.4th 606, 617 (8th Cir. 2022). Upon that conclusion, the Court would usually turn to whether there is evidence of "the requisite degree of fault on the part of the [county] and a causal link" with the "alleged violation" sufficient to survive summary judgment. *Veatch*, 627 F.3d at 1257.

That inquiry is not necessary here, though. *See* NECivR 39.2(c) (explaining that "a judge may treat a party's failure to file a brief or discuss an issue in a brief as an abandonment of that party's position on any issue not briefed or discussed"). In its brief in support of its motion for summary judgment and its brief opposing Harbison's motion for summary judgment, the county limits its arguments to whether there was an underlying constitutional violation. While it briefly refers to the general principles of *Monell* and its progeny, nowhere does the county assert it is entitled to summary judgment as to whether it could be held liable for any alleged underlying violation on Harbison's argument that it failed to train its employees and establish adequate policies. *See Spann v. Lombardi*, 960 F.3d 1085, 1088 (8th Cir. 2020) (explaining that "a district court does not abuse its discretion by declining to address an argument for summary judgment that is not properly briefed"); *Robinson v. White County*, 452 F.3d 706, 714 (8th Cir. 2006) (concluding the movant failed to meet its initial burden on summary judgment because they "failed to identify any grounds beyond qualified immunity demonstrating the absence of genuine issues of material fact" and the official was not entitled to

qualified immunity), *vacated in part on rehearing by Robinson v. White County*, 459 F.3d 900, 902 (8th Cir. 2006).

Because the Court finds there are triable issues as to whether Danielle's Fourteenth Amendment rights were violated by the jail officers and the county has failed to present other grounds on which they are entitled to summary judgment, its motion is denied as to Harbison's § 1983 claim against the county.

### c.    PSTCA Claim

Under Nebraska law, "no suit may be maintained against the State or its political subdivisions unless the Legislature, by law, has so provided." *Clark v. Sargent Irrigation Dist.*, 971 N.W.2d 298, 307-08 (Neb. 2022) (describing the common-law, jurisdictional doctrine of sovereign immunity). The PSTCA constitutes a limited waiver of sovereign immunity, providing that a "political subdivision shall be liable in the same manner and to the same extent as a private individual under like circumstances" when properly sued under the statute. Neb. Rev. Stat. § 13-908. That waiver does not apply, however, to "[a]ny claim arising out of assault, battery, false arrest, false imprisonment, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." *Id.* § 13-910(7).

"Statutes that purport to waive the protection of sovereign immunity . . . are strictly construed in favor of the sovereign and against the waiver," requiring a broad reading of "exemptions from a waiver of sovereign immunity." *Reiber v. County of Gage*, 928 N.W.2d 916, 928 (Neb. 2019). The plaintiff generally bears the burden to show the government has waived sovereign immunity. *See Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019) (stating "[t]he plaintiff bears 'the burden of proving the existence of subject matter jurisdiction'" (quoting *Green Acres Enters., Inc. v. United States*, 418 F.3d 852, 856 (8th Cir. 2005))); *Taylor v. United States*, 248 F.3d 736, 737 (8th Cir. 2001) ("To sue the United States, Appellants must show both a waiver of sovereign immunity and a grant of subject matter jurisdiction.")

The language of the PSTCA's intentional-tort exception is "strikingly broad." *Edwards v. Douglas County*, 953 N.W.2d 744, 755-56 (Neb. 2021); *see also United States v. Shearer*, 473 U.S. 52, 55 (1985) (describing a similar exception in the Federal Tort Claims Act as using "sweeping language"). That language requires the Court to ignore the formal label of a plaintiff's claim and focus on the "gravamen" or "substance . . . as a whole" of their complaint against the political subdivision. *Barber v. State*, 4 N.W.3d 844, 856 (Neb. 2024); *see also Joshua M. v. State*, 5 N.W. 454, 473 (Neb. 2024) (describing the line of cases in which the Nebraska Supreme Court "focused on the nature of the personal injury claim, rather than the allegation of negligence asserted against the government" in finding a claim was barred by the intentional-tort exception). The question the Court must therefore answer "is whether the injury the plaintiff seeks to recover for stems from, arises out of, is inextricably linked to, and would not exist without an underlying" intentional tort. *Dion v. City of Omaha*, 973 N.W.2d 522, 545-46 (Neb. 2022); *see also Moser v. State*, 948 N.W.2d 194, 202 (Neb. 2020) (explaining that "if a claim would not exist without an assault or battery, it arises out of that battery" for purposes of the PSTCA).

Taking a note—and a large verbatim part of the briefing—from Bellevue's summary-judgment motion, the county asserts Harbison's claims against it arise out of complaints of false arrest and false imprisonment. Under Nebraska law, "[f]alse imprisonment is the unlawful restraint of a person's liberty against his or her will." *Davis v. State*, 902 N.W.2d 165, 186-87 (Neb. 2017) (finding the plaintiff's negligence claim arose out of a false imprisonment where he alleged "that prison officials detained him past his correct release date"). The unlawfulness of an arrest or imprisonment is an essential element of such a claim. *See Huskinson v. Vanderheiden*, 251 N.W.2d 144, 146 (Neb. 1977); *see also Kurtz v. City of Shrewsbury*, 245 F.3d 753, 758 (8th Cir. 2001) (explaining a plaintiff cannot sustain a false arrest claim under § 1983 "where the officer had probable cause to make the arrest"); *Wilson v. Gutschenritter*, 175 N.W.2d 282, 286 (Neb. 1970) ("Where one is properly arrested by lawful authority, even though without a

warrant, an action for false imprisonment cannot be maintained." (internal citation omitted)).

On Bellevue's motion for summary judgment, the Court noted Harbison "did not appear to dispute that false imprisonment is at issue [in this action], at least in part," having stated Bellevue was "correct about [its] reading of the [intentional-tort exception]." Nor has Harbison since sought to correct that reading with regard to his PSTCA claim against Bellevue. In contrast, Harbison is now unequivocal that he "does not claim a false arrest or false imprisonment of Ms. Harbison." He further argues Danielle's arrest and imprisonment "were not false or unlawful" under the circumstances and "[j]ust because [Danielle] was in custody does not mean that her claim arises out of false imprisonment or false arrest."

In light of the parties' present arguments, the Court concludes that Harbison has met his burden to show the intentional-tort exception is likely inapplicable to his claim as it now exists. Harbison sufficiently demonstrates the gravamen of his claim against the county is that Danielle's death was caused by county officials' failure to provide proper medical treatment, train officers, and establish appropriate policies and procedures, not any intentional tortious conduct. Importantly, Harbison's Second Amended Complaint contains no allegations regarding the unlawfulness of Danielle's arrest or detention.

Further, in all cases where the intentional-tort exception has been found to apply, the claimed injury could be traced to some underlying intentional conduct separate from the alleged negligence of state actors. *See*, *e.g.*, *Edwards v. Douglas County*, 953 N.W.2d 744, 757 (Neb. 2021) (finding the exception applied to the plaintiff's claim that the county negligently handled emergency telephone calls and, as a result, emergency personnel did not arrive in time to prevent her assault at the hands of her former partner); *Joshua M.*, 5 N.W.3d at 477-78 (concluding the exception applied to foster siblings' claim that a state agency failed to protect them from the abuse of their foster parents). But the county does little here to illustrate any intentional conduct underlying Harbison's

claim in light of his insistence that her arrest and detention were lawful.  Its mere reliance on the Court's interlocutory determination, made on different motions and arguments, fails to warrant summary judgment in its favor or rebut Harbison's current persuasive assertion that his claims do not arise out of false imprisonment or false arrest.  *See United States v. Hively*, 437 F.3d 752, 766 (8th Cir. 2006) (explaining that a court is not bound by its decision on a rule of law in an interlocutory order at subsequent stages of a case).

Upon a close review of the record and the present arguments, the Court is convinced sovereign immunity does not bar Harbison's claims against the county.  Its motion for summary judgment on that claim is therefore denied.

### 2.    Harbison's Motion for Partial Summary Judgment

For his part, Harbison asserts the defendants "cannot establish any basis on which judgment should not be granted determining both liability for negligence under the PSTCA and violation of [Danielle's] constitutionally protected rights pursuant to § 1983." The county asserts his motion must be denied because it cannot be held liable under § 1983 or the PSTCA, and fact issues as to contributory negligence and conflicting expert opinions preclude summary judgment (Filing No. 262).  The Court agrees, though for different reasons, that Harbison is not entitled to summary judgment.

### a.    Section 1983 Claim

As described above, establishing a "constitutional violation is a threshold issue" with regard to Harbison's § 1983 claim against the county.  *Rusness*, 31 F.4th at 617.  To hold the county liable for any violation of Danielle's rights, Harbison must also show the county itself was responsible for the alleged deprivation.  *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  A claimant under § 1983 can do that in a number of ways, including by showing "the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise."  *Kiefer v. Isanti County*, 71 F.4th 1149, 1152 (8th Cir. 2023) (quoting *Corwin v. City of Indep.*, 829 F.3d 695, 699-70 (8th Cir. 2016)).

22

Here, Harbison argues the county and sheriff's office's "inadequate policies, training, and customs" were moving factor[s] behind" the alleged violation. In supporting his motion for summary judgment, however, Harbison proffers no explanation of any county custom he believes underlies the county's alleged failure to render Danielle proper medical care. *See id.* at 1153 (stating a plaintiff must establish "the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees" and "deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct" to demonstrate a custom giving rise to § 1983 liability). Nor does he sufficiently demonstrate the county maintains either facially unlawful policies or lawful policies adopted with "deliberate indifference as to [their] known or obvious consequences." *Goldberg v. Hennepin County*, 417 F.3d 808, 812 (8th Cir. 2005) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997)).

Further, "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). But such inadequate training is actionable "[o]nly where a [county's] failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." *Canton*, 489 U.S. at 389.

The first question in failure-to-train cases, therefore, is whether the challenged training program is adequate "in relation to the tasks the particular officers must perform." *Id.* at 390. The second question, if reached, is whether the allegedly inadequate training represents a government policy. *Id.* It will not "suffice to prove that an injury or accident could have been avoided if an officer had had better or more training." *Id.*

Deliberate indifference in this context is an objective, stringent standard. *See Connick*, 563 U.S. at 61; *S.M. v. Lincoln County*, 874 F.3d 581, 585 (8th Cir. 2017). It

23

requires proof that the county was on "actual or constructive notice that a particular omission in their training program causes [county] employees to violate citizen's rights." *Connick*, 563 U.S. at 61. In rare circumstances, a plaintiff may be able to show the county was deliberately indifferent because the "unconstitutional consequences of failing to train [are] so patently obvious" under the circumstances. *Id.* at 63-64. Otherwise, such a claim usually necessitates evidence of "[a] pattern of similar constitutional violations of untrained employees." *Id.* at 62.

Like with his other theories for *Monell* liability, Harbison has not yet even attempted to provide evidence to satisfy that burden. For that reason, he has failed to demonstrate he is entitled to summary judgment on his § 1983 claim. Fed. R. Civ. P. 56(a).

### b.  PSTCA Claim

With regard to Harbison's negligence claim under the PSTCA, the "determination of whether a party deviated from the standard of care and was therefore negligent is a question of fact" generally left to a jury. *Reiber*, 928 N.W.2d at 925; *see also Estate of Block by Hoffman v. Estate of Becker by Becker*, 986 N.W.2d 726, 736 (Neb. 2023) (explaining that "where different minds may draw different inferences from the same facts, whether such facts establish negligence is a proper question for the jury, not for the court"). Harbison admits as much; the authority he quotes in support of summary judgment demonstrates that, under Nebraska law, fact-intensive questions related to "whether appropriate care was exercised" by the defendants are left to "the trier of fact unless no reasonable person could differ on the matter." *Pittman v. Rivera*, 879 N.W.2d 12, 17 (Neb. 2016).

Causation is also usually a question for the jury but "can provide the basis for summary judgment when 'the question is so free from doubt as to justify taking it from the jury.'" *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002) (quoting *Ricketts v. City of Columbia*, 36 F.3d 775, 779 (8th Cir. 1994)). The Court is not

convinced on the present record that this is such a case.  Because Harbison fails to make that onerous showing, the Court finds his PSTCA claim also presents issues for trial.  His motion for partial summary judgment is therefore denied in its entirety.

Based on the foregoing,

IT IS ORDERED:

1.    Defendant the County of Sarpy, Sarpy County Sheriff's Office, and Sheriff Jeff Davis's Motion for Summary Judgment (Filing No. 252) is denied.

2.    Plaintiff Brad Harbison's Motion for Summary Judgment (Filing No. 255) is also denied.

3.    Defendants Sarpy County Sheriff's Office and Sheriff Jeff Davis are dismissed as parties as the claims against them are properly pursued against the County of Sarpy itself.

Dated this 25th day of June 2024.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge

25